## POOR v. HUDSON INSURANCE COMPANY.

*(Circuit Court, D. New Hampshire.* May 1880.)

INSURANCE—PROPOSITION FOR CANCELLATION OF RISK—CONDITIONAL ACCEPTANCE.—An insurance agent proposed as to a certain risk to cancel the policy in whole or in part, place the risk in another company named, or return the premium. The agent of the insured returned the policy to him, directing that the risk be placed in the company named. The insurance agent wrote "cancelled" upon the policy, but before reinsuring, the building was destroyed. *Held*, that as the condition upon which the cancellation was authorized had not been complied with, the insurance company could not insist upon the attempted cancellation as relieving it from liability.

**FAMILY—DEFINITION OF.**—A family is a number of persons living together in one house and under one management or head. No specific number is requisite to constitute such family, nor is it necessary that they eat in the same house.

**INSURANCE—CONDITION AS TO OCCUPANCY.**—A policy of insurance upon a building used as a summer hotel provided that a family should live in it throughout the year. It was destroyed by fire in November, and at the time of its destruction two men servants and employes of the insured were staying therein, taking their meals at an adjoining hotel, and working around the premises. *Held,* sufficient to support a verdict for plaintiff.

**SAME—SAME—INSTRUCTIONS.**—Instructions as to whether such condition was complied with *held* proper.

**SAME—STATEMENTS MADE TO AGENT AT TIME OF INSURANCE.**—Evidence of what was said to the insurance agent at the time of the insurance, as to how the house had been occupied the previous year, *held* competent, as aiding to arrive at the intention of the parties and true interpretation of the contract.

*John S. H. Frink* and *A. R. Hatch,* for plaintiff.

*S. C. Eastman* and *G. Marston,* for defendant.

CLARK, D. J.    This was an action on a policy of insurance issued by the defendants upon the Oceanic Hotel, at Star island, one of the Isles of Shoals, against fire. The policy was dated July 25, 1875, for $2,500, and the hotel was burned November 11th, following, at 3 o'clock in the morning. The insurance was procured by Reed Bros., of Boston, as agents for Mr. Poor, through Mr. Craig, of Portsmouth, as agent of the company. At the trial of the cause before a jury two principal questions arose—*First,* whether the policy, which was for one year, had been cancelled by agreement of parties before the loss occurred; and, *second,* whether the hotel was occupied, at the time of the fire, as stipulated in the policy.

Some time before the loss happened the defendant company became dissatisfied with the risk, and instructed Mr. Craig, their agent, to procure a diminution of it in part, or in its entirety. Thereupon Mr. Craig wrote to Reed Bros., at Boston, stating the wishes of the Hudson company, and proposing to reduce the risk one-half or in the whole; and stating further that he could place the risk in the Lancashire company, or he would return the premium. Reed Bros. returned answer that they did not wish the risk divided, half in the

Hudson company, and half in the Lancashire company; but that the policy might be cancelled, and the whole risk put in the Lancashire, and the unexpired or return premium used for re-insurance, and they inclosed the policy to Craig for that purpose.

Upon receiving the policy, November 9, 1875, Craig immediately wrote "cancelled" upon it. But he did not place the risk in the Lancashire company, or any other. He made up the return premium and placed it with the policy, thus marked "cancelled," in the safe, intending to go to Boston the next morning, the tenth. But he did not go; and the next morning, the eleventh, the fire occurred, with the policy and premium still in Craig's safe. He gave no notice to Reed Bros., or Mr. Poor, that he had not re-insured the property. The next day, the eleventh, after the fire, Craig sent the return premium to Reed Bros., at Boston, by express; but they declined to receive it. Of this proceeding, or negotiation for cancellation of the policy, Poor had no knowledge, nor had he given any authority for it, other than that the Reed Bros. were agents to procure the insurance for him.

Upon this evidence the court ruled that there was no contract for cancellation of the policy completed which could bind the parties; that, waiving the question of authority in Reed Bros. to make a contract for cancellation, they had consented to it only with the understanding that Craig should procure a re-insurance in the Lancashire company; and, failing to do this, the Hudson company could not insist that the policy was cancelled and leave Poor to bear the loss, especially as they had not given him notice that they had not re-insured or returned him the premium. To this ruling the defendant excepted. But it was, we still think, correct.

The first proposition of the Hudson company was to cancel the policy in whole or in part; to place the risk in the Lancashire company or return the premium, as the plaintiff might elect. He assented that the policy might be cancelled for the whole, and the property re-insured by them in the Lancashire company. The two were coupled together, and there is no evidence that the plaintiff agreed that the policy should

be cancelled without a re-insurance, and as the Hudson company did not re-insure they cannot insist upon the cancellation. There was no agreement of parties. 1 Parsons on Contracts, 6.

There was a stipulation in the policy that the defendant company might terminate the insurance "at any time, on giving notice to that effect, and refunding a ratable proportion of the premiums;" and the defendant's counsel insist that Craig, in writing to Reed Bros., had this provision in his mind, and acted in reference to it. This may be so. But before he could have the benefit of that stipulation, even if acting upon it, he should have conformed to it, and given notice, and returned the required part of the premium. This he did not do.

The counsel for the defendant requested the court to instruct the jury that the letter of Craig contained a proposition to cancel or reduce the Hudson policy, and that this was made by him as the agent of that company; but that the proposition to re-insure in the Lancashire company was made by him (in the letter) as the agent of the Lancashire company, and that the letter of Reed Bros. was an acceptance of the proposition of the Hudson Insurance Company to cancel the policy, without including the other, to re-insure. The court declined so to instruct, and properly.

It was a question of fact and not of law whether Craig acted as the agent of one company or the other, or both; and if Craig was the agent of the Lancashire company in offering to procure a re-insurance, it can make no difference, because Reed Bros., in accepting the proposition to cancel the Hudson company's policy, coupled it with a re-insurance of the property in the Lancashire company, which was not done by Craig, whether as agent of one company or the other.

In support of the second ground of defence, that the hotel had not been occupied as agreed in the policy it should be, to-wit, that a family should live in it throughout the year, there was evidence tending to show that the house was occupied as a hotel in the summer, but not at other seasons; that the defendant's agent, at the time of the insurance, knew the

manner of its occupation; that the plaintiff, with his wife and sons, were at the hotel in the summer, managing the hotel, and had in their family a large number of employes and servants; that part of the family ate at the Oceanic, and part at the Atlantic, a house used as a part of the hotel arrangement; that the plaintiff, with his wife and sons, left the hotel at the close of the hotel season, but left there a large number of their employes, at work about the premises and in charge of the property, under the direction and management of the plaintiff; that all of these employes ate at the Atlantic House, and most of them slept there; but that two of them roomed and slept in the Oceanic, having their clothing there, and working outside and about the house, going in and out several times a day; that they had been in the employ of the plaintiff for months, and one of them was a porter in the hotel— the Oceanic—and that both were in the building at the time of the fire, and escaped through the window; that the plaintiff was often at the island and "stopped" at the Oceanic; that he was there the day before the fire; that Craig, the agent of the defendants, knew how the hotel was occupied and was satisfied; and that another agent of the defendant knew of it, and was satisfied that the employes should eat at the Atlantic House.

Upon this evidence the defendant's counsel requested the court to instruct the jury:

"*First.* That the occupation of the premises insured by two hired men, in the plaintiff's employ, who slept in the house and took their meals elsewhere, being employed during the day elsewhere, was not such an occupation of the premises as complied with the warranty that a family should live in the house.

"*Second.* That if the jury should find Poor and wife and children had left the Oceanic and were living at his residence at Somerville, and that the only occupation of the hotel was by two laborers sleeping in it, taking their meals elsewhere, and spending their days elsewhere in labor or matters outside of the house, such occupation would not be a compliance with this warranty.

"*Third.* That under such circumstances two laborers would not be a part of Poor's family.

"*Fourth.* That under such circumstances the two laborers would be a part of the family living at the Atlantic House; the foreman in charge of the island living at the Atlantic House, and furnishing at that house the meals to all persons in the employ of the plaintiff, including the two laborers who slept in the Oceanic House.

"*Fifth.* That upon all the evidence the jury would not be warranted in finding that the warranty had been complied with."

The court declined to instruct the jury specifically as requested, but did charge them that the warranty in the policy "that a family should live in the house throughout the year" was a contract which must be substantially complied with in its terms to enable the plaintiff to recover; that it was not sufficient that there were watchmen in the house, or that it was equally safe by some other means, but that the defendant had the right to insist that it should be occupied as agreed; that the words "family" and "live" were used in the policy in their ordinary signification, as a collection of persons dwelling together in a house under one head; that no definite, particular number of persons was necessary to constitute a family, but it should be a family as ordinarily constituted, and living in the ordinary way; that a knowledge on the part of the defendants that the house was occupied in any other manner could not affect the contract, unless assented to by the defendants, or they acted in such a way as to leave the plaintiff to believe that they did assent to it.

To these instructions the defendants take no exception; but they do except that the specific rulings desired by them were not made.

But upon mature reflection we are satisfied that they have no legal cause for complaint; the jury were sufficiently instructed in the law applicable to the case.

Whether a house is or is not occupied by a family is a question of fact, and should be decided by the jury, and not by the court; and whether a given number of persons consti-

tute a family is oftentimes, perhaps always, to be decided in the manner in which they live, which is, as before stated, a question of fact.

The most comprehensive definition of a family is, a number of persons who live in one house and under one management or head.    There is no specific number required to constitute a family; but they must live together in one house and under one head.    Nor is it necessary they should eat in the house where they live.    There are many families, it is well known, who live in one place and eat outside of it.    Nor was it necessary that they should be employed in the house or about it; nor was it material that they were hired.    The precise question is, were they living there together, under one head or management?    This is one of fact and not of law.

The evidence tended to show that these two men lived at the Oceanic; that they were in the employ of the plaintiff, and under his direction, control and management.  He owned the house in which they abode—not as tenants, but as servants or employes.    It could not be decisive of the question, as matter of law, that the wife and sons of the plaintiff lived at Somerville, and that he passed most of his time there.  He was often at the Shoals, and stayed at the Oceanic when there.    Many persons have residences in town, and at the seaside or mountains, or in the country, at the same time, and may be said to live in both places; they have their servants and employes at both places.

The court could not instruct the jury, as requested, that the two laborers would not be a part of the plaintiff's family, under these circumstances; the evidence rather tended to show the contrary—that they were a part of his family; he so testified.

Nor could the court instruct the jury, upon all the evidence, that they would not be warranted in finding that the warranty had been complied with, as there was evidence tending to show that the defendants' agent, who contracted the insurance, knew how the house was occupied, and was satisfied with it, and this evidence might be weighed by the jury in determining whether the defendants knew how the house was

occupied and assented to it as a compliance with the contract or waived a more strict compliance.

The defendants are mistaken in supposing there was no evidence to go to the jury in regard to a waiver. There was evidence that Craig said that he knew how the house was occupied, was satisfied with that occupancy, and considered it safer than a family.

The defendant says, in the brief of his counsel, "what was really left to the jury was the meaning of the terms used," and "the legal effect of the instruction of the court was to advise the jury as to the legal effect of the acts in the contract, leaving them to construe the laws."

In this there is a mistake. The court did not leave to the jury "the meaning of the terms used." It instructed the jury as to the meaning of the words, and the counsel say, in their brief, the explanation given of the word "family" was correct and satisfactory. Nor did the court leave the laws to the jury. It instructed that the provision in the policy that a family should live in the house was a contract binding on the plaintiff, and must be performed by him, or waived by the defendants, before he could recover. The court instructed the jury what a family was. With that instruction the defendant was satisfied. The court left it to the jury to find *the fact* whether such a family was living in the house at the time of the fire. That duty belonged to them.

At the trial the court admitted evidence that, at the time the insurance was effected, the plaintiff's agent told the defendant's agent how the house had been occupied the previous winter. To this evidence the defendant's counsel objected, on the ground that whatever was said at the time of the contract was merged in the contract, and could not be received to control, enlarge, or restrict the contract.

Such is undoubtedly the law; but the court did not admit the evidence for such purpose, but as tending to show the previous occupation and condition of the property, as aiding to arrive at the intention of the parties, and the true interpretation of the contract. For this purpose we think the evidence was competent.

The defendant also objected that the plaintiff's witnesses were permitted to testify that Craig, since the fire, had said that he knew how the house was occupied, and was satisfied with that occupancy, and considered it safer than a family. But, as he does not notice the objection in his brief, it may be that he does not, after reflection, rely much upon it. However that may be, the evidence was competent upon either of of two grounds—*First,* as tending to show a substantial compliance with the contract by the plaintiff; and, *second,* a waiver by defendant of a more strict compliance.

Judgment on the verdict.